**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| ELECTRICAL WORKERS PENSION FUND LOCAL 103 I.B.E.W., on behalf of itself and all others similarly situated, | ) ) ) ) ) | No. |
| *Plaintiff*, | ) ) ) | CLASS ACTION COMPLAINT |
| vs. | ) ) | JURY TRIAL DEMANDED |
| BANK OF AMERICA, N.A., BANK OF AMERICA MERRILL LYNCH INTERNATIONAL LIMITED, ROYAL BANK OF SCOTLAND PLC, NATIONAL WESTMINSTER BANK PLC, NATWEST MARKETS SECURITIES INC. (F/K/A RBS SECURITIES INC.), and JOHN DOES 1-50, | ) ) ) ) ) ) ) ) | |
| *Defendants*. | ) ) ) | |

Plaintiff Electrical Workers Pension Fund Local 103 I.B.E.W., on behalf of itself and all others similarly situated, files this Complaint against Defendants Bank of America, N.A., Bank of America Merrill Lynch International Limited (collectively, "Bank of America"); Royal Bank of Scotland plc, National Westminster Bank plc, Natwest Markets Securities Inc. (f/k/a RBS Securities Inc.) (collectively, "RBS"); and John Does 1-50. Plaintiff's claims arise from Defendants' unlawful, anticompetitive scheme to fix, raise, maintain, stabilize, or otherwise manipulate the price of Euro-denominated bonds issued by European central banks ("Eurozone Government Bonds") and sold and purchased throughout the United States. Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.     In this action, Plaintiff seeks damages arising from Bank of America, RBS, and their co-conspirators' unlawful conduct to fix, raise, maintain, stabilize, or otherwise manipulate the prices of Eurozone Government Bonds sold to or bought from U.S. investors throughout the United States.

2.     Eurozone Government Bonds are sovereign debt issued by European central governments that have adopted the Euro as their official currency, including Austria, Belgium, Finland, France, Germany, Italy, Portugal, Greece, Ireland, the Netherlands, and Spain, among others. The estimated value of the Eurozone Government Bond market is around $9.4 trillion. Major purchasers and holders of Eurozone Government Bonds include institutional investors, mutual funds, hedge funds, and pension funds in the United States.

3.     Defendants are among the world's largest dealers of Eurozone Government Bonds. They compete for customers based on the prices they offer for the purchase and sale of Eurozone Government Bonds. Bond dealers typically quote bond prices to investors by providing them with their bid and ask prices. Generally, the smaller the "spread" (difference) between the "bid" (buy) and "ask" (sell) prices the better and more competitive the prices are for customers.

4.     Defendants also compete to acquire Eurozone Government Bond primary offerings—*i.e.*, the initial auctions of Eurozone Government Bonds by European central banks. Eurozone Government Bond issuing central banks often favor those institutions that have demonstrated the ability to provide liquidity in the post-auction (*i.e.*, "secondary") market by standing ready to trade large volumes of that issuer's bonds. These institutions are known as "primary dealers," and they hold significant power and influence in the Eurozone Government Bond market.

5.      For example, in exchange for their ability to make markets for Eurozone Government Bonds, primary dealers are granted privileged access to non-public information about new Eurozone Government Bond issuances, as well as funding needs for the central governments issuing them. In addition, primary dealers obtain valuable customer order-flow information in the run-up to the auction, which allows them to gauge investor appetite for the newly auctioned Eurozone Government Bonds that will then trade in the secondary market.

6.      In a normally functioning market, primary dealers—Bank of America, RBS, and their co-conspirators here—compete against each other for customer orders in the auction and secondary markets. Competition is primarily driven by the prices at which primary dealers are willing to buy and sell Eurozone Government Bonds. Generally speaking, the narrower the bid-ask spread, the more competitive the price.

7.      However, from at least as early as January 1, 2007 and continuing through at least December 31, 2012, rather than compete with each other, Defendants colluded to fix the prices at which they bought and sold Eurozone Government Bonds. That is, they agreed to widen the bid-ask spreads they quoted to customers, thereby increasing the prices investors paid for the Eurozone Government Bonds or decreasing the prices at which investors sold the bonds. No primary dealer could widen its bid-ask prices unilaterally without losing trading business to its competitors. Such action also could jeopardize a primary dealer's ability to secure new underwriting business from Eurozone Government Bond issuers in the future. Thus, Defendants conspired with each other to widen the bid-ask prices—a sort of "safety in numbers" approach (albeit an illegal one).

8.      Defendants' traders orchestrated and maintained their conspiracy via regular electronic communications, including instant messaging and chatrooms. Through such

communications, these traders discussed their respective customers' identities and confidential information about the size and nature of their orders before deciding the prices that they would quote to their customers for Eurozone Government Bonds.

9.    Defendants' conduct was discovered by European regulators, who engaged in an extensive investigation. The investigation resulted with the European Commission ("the Commission") issuing a Statement of Objections in January 2019, alleging that eight banks:

> participated in a collusive scheme that aimed at distorting competition when acquiring and trading European government bonds ("EGBs"). Traders employed by the banks exchanged commercially sensitive information and coordinated on trading strategies. These contacts would have taken place mainly—but not exclusively—through online chatrooms.[1]

According to reports, the banks subject to the Statement of Objections included Defendants Bank of America and RBS.[2] A Statement of Objections reflects the Commission's preliminary view that the banks violated European competition laws. If the violation is confirmed, the Commission can levy fines of up to 10% of each bank's global revenue.

10.    Defendants' misconduct has injured U.S. investors in Eurozone Government Bonds. Defendants have inflated the prices at which they sold Eurozone Government Bonds to investors and reduced the prices at which they purchased these products from investors, including Plaintiff and members of the Class (defined below). Thousands of U.S.-based investors have transacted billions of dollars' worth of Eurozone Government Bonds in the United States

---

[1] European Commission, Press Release, "Antitrust: Commission sends Statement of Objections in European government bonds cartel" (Jan. 31, 2019), http://europa.eu/rapid/press-release_IP-19-804_en.htm.

[2] See Ludovic Marin, *EU accuses 8 banks of forming Eurozone Government Bond cartel*, AFP (Jan. 31, 2019), http://a.msn.com/01/en-us/BBT0lH0?ocid=st; Stephania Spezzati, *RBS Said to Be Among Eight Banks in Euro Bond Cartel Probe*, Bloomberg (Feb. 14, 2019), https://www.bloomberglaw.com/product/antitrust/document/X9KER2TO000000?bna_news_filter=mergers-and-antitrust&jcsearch=BNA%252000000168ebdad633adfdfbdecc890000#jcite.

directly with Defendants. Plaintiff, on behalf of itself and all others similarly situated, seeks

damages as a result of the unlawful conduct, trebled as provided by law.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under Sections 4 and 16 of the Clayton

Act (15 U.S.C. §§ 15(a) and 26). This Court also has subject matter jurisdiction under 28 U.S.C.

§§ 1331 and 1337(a).

12.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C.

§ 1391(b), (c), (d) because during the Class Period all Defendants resided, transacted business,

were found, or had agents in this District; a substantial part of the events or omissions giving rise

to these claims occurred in this District; and a substantial portion of the affected interstate trade

and commerce discussed herein has been carried out in this District.

13.     This Court has personal jurisdiction over each Defendant, because each Defendant

transacted business throughout the United States, including in this District; had substantial

contacts with the United States, including in this District; and/or committed overt acts in

furtherance of their illegal scheme and conspiracy in the United States.

14.     In addition, the conspiracy was directed at, and had the intended effect of, causing

injury to persons residing in, located in, or doing business in the United States, including in this

District, and Plaintiff's claims arise out of Defendants' conduct. Defendants' Eurozone

Government Bond traders dealt directly with U.S.-based investors, buying and selling Eurozone

Government Bonds from and to them in a continuous flow of interstate and foreign commerce.

Accordingly, Defendants' anticompetitive conduct had direct, substantial, and reasonably

foreseeable effects on U.S. commerce.

15.     The activities of Defendants were within the flow of, were intended to, and did

have a substantial effect on the interstate and foreign commerce of the United States.

## THE PARTIES

### A.     Plaintiff

16.     Plaintiff Electrical Workers Pension Fund Local 103 I.B.E.W. ("IBEW Local 103") is a defined-benefit plan located in Dorchester, Massachusetts. IBEW Local 103 manages more than $1 billion in assets on behalf of over 8,000 members and beneficiaries. Plaintiff directly transacted in Eurozone Government Bonds with one or more of the Eurozone Government Bond cartel members, including Bank of America and RBS. As a direct and proximate result of Defendants' collusive and manipulative activities, Plaintiff was injured in its business or property.

### B.     Defendants

17.     Defendant Bank of America, N.A. ("BANA") is a Delaware corporation with its principal place of business located at 100 North Tryon Street, Charlotte, North Carolina.

18.     Defendant Bank of America Merrill Lynch International Limited ("BAML International") U.K. company and a subsidiary of Bank of America, N.A., with its principal place of business located at 2 King Edward Street, London EC1A 1 HQ, England.

19.     Defendants Bank of America and BAML International are collectively referred to as "**Bank of America**." During the Class Period, Bank of America traded Eurozone Government Bonds directly with investors in the United States.

20.     Defendant Royal Bank of Scotland plc ("Royal Bank of Scotland") is a United Kingdom public limited company with its principal place of business located at 36 St. Andrew Square, Edinburgh, EH2 2YB, Scotland. During the Class Period, Royal Bank of Scotland maintained a branch at 600 Washington Boulevard, Stamford, Connecticut.

21.     Defendant National Westminster Bank plc ("Natwest") is a U.K. public limited company with its principal place of business at 135 Bishopsgate, London, EC2M 3UR, United Kingdom.

22.     Defendant Natwest Markets Securities Inc. (f/k/a RBS Securities Inc.) ("Natwest Securities") is a Delaware corporation with its principal place of business at 600 Washington Boulevard, Stamford, Connecticut.

23.     Royal Bank of Scotland is regulated by the Board of Governors of the Federal Reserve System. Royal Bank of Scotland listed its Connecticut branch as a Material Entity in its FDIC Resolution Plan.[3]

24.     Royal Bank of Scotland, Natwest, and Natwest Securities, and their subsidiaries and affiliates, are referenced collectively in this Complaint as "**RBS**." During the Class Period, RBS traded Eurozone Government Bonds directly with investors in the United States.

25.     John Does 1-50 are various entities and individual unknown to Plaintiff at this time who participated as co-conspirators in the acts complained of, and who performed acts and made statements that aided and abetted and were in furtherance of the unlawful conduct alleged in this Complaint. Among the John Does include the still to be identified banks that received the Commission's Statement of Objections.

## FACTUAL BACKGROUND

### A.     <u>Eurozone Government Bond Primary Market</u>

26.     Government entities issue debt in the form of bonds, which are typically used to fund ongoing and future operations.

---

[3] Public Section The Royal Bank of Scotland Group plc Resolution Plan, RBS, at i-6, https://www.fdic.gov/regulations/reform/resplans/plans/rbs-165-1512.pdf.

27. Debt issued by national governments is called "sovereign debt." Examples of Eurozone sovereign debt include French OATs (Obligations Assimilables du Tresor) (treasuries); Italian BOTs (Buoni Ordinari del Tesoro) (treasuries), Spanish Bonos (bonds) and Obligaciones del Tesoro (treasuries), and German Bunds (bonds).

28. There is approximately $9.4 trillion (€8.3 trillion) in outstanding Eurozone Government Bonds, with much of it increasingly held by non-European investors, including those in the United States.

29. Eurozone Government Bonds are typically sold in auctions sponsored by central governments' ministries of finance within the Eurozone. Although less common, Eurozone Government Bond offering can also be made through syndication, in which a group of banks underwrites and conducts the initial sales of Eurozone Government Bonds. For example, for portions of 2011, Spain and Belgium both used syndicates to sell 10-year Eurozone Government Bonds.

30. The sale of Eurozone Government Bonds during the period around the auction (or syndication) is known as the "primary market." All auction procedures are designed to encourage active, competitive, and non-collusive participation in the auctions. However, the procedures themselves differ among the Eurozone countries. Some countries, like Italy and Finland use a uniform price system, where all successful bids pay the same price. Others, like Germany, France, Austria, and Belgium, use a multiple price system, where successful bidders receive a price based on the prices they actually bid. Still others, like Spain, use a hybrid system, where bids made at the minimum price are accepted at the same price; bids falling between the minimum and rounded-up weighted average price also pay the price actually bid; and bids higher than the rounded-up weighted average price pay the rounded-up weighted average price.

31.     To ensure active participation in their auctions, European central governments issuing Eurozone Government Bonds typically select a relatively small group of banks to serve as "primary dealers" of the Eurozone Government Bonds. Some, typically smaller Eurozone countries, restrict access to auction exclusively to primary dealers.

32.     Often, the same banks act as primary dealers for multiple central governments' Eurozone Government Bonds. For example, Germany, France, Italy, and Spain—the four largest Eurozone economies—each have shared (and continue to share) the following primary dealers: Barclays, BNP Paribas, Citigroup, Credit Agricole CIB, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, HSBC, Morgan Stanley, Nomura, RBS, and Societe Generale. Germany, France, and Italy have also shared Bank of America as a primary dealer.

33.     Even smaller Eurozone economies have shared (and continue to share) many of these same primary dealers, including:

(a)     *Austria*: Bank of America, Barclays, BNP Paribas, Credit Agricole CIB, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Nomura, RBS, and Societe Generale;

(b)     *Greece*: Bank of America, Barclays, BNP Paribas, Citigroup, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Nomura, RBS, and Societe Generale;

(c)     *Ireland*: Bank of America, Barclays, BNP Paribas, Citigroup, Credit Agricole CIB, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Nomura, RBS, and Societe Generale;

(d)     *Portugal*: Barclays, BNP Paribas, Citigroup, Credit Agricole CIB, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Nomura, RBS, and Societe Generale.

34.     Many smaller Eurozone countries have "closed" auctions where only primary dealers can bid directly in the auctions. By contrast, others like France, Italy, and Spain, permit "open" auctions where any entity that registers with these countries' respective ministries of finance can bid directly in the auctions.

35.     Typically, the banks are selected as primary dealers based on the following criteria:

(a)     Their experience in trading sovereign debt and long-term commitment to participating in the sovereign debt market;

(b)     Their ability to make markets for investors in the post-auction or "secondary market;"

(c)     Their financial strength, which includes their credit rating, capitalization, and appetite for risk; and

(d)     Their general ability to promote an active trading market for a country's Eurozone Government Bonds.

36.     Primary dealers are generally required, at each auction, to bid a certain, minimum percentage of the full offering. The minimum bid requirement is usually determined as the ratio of the total number of primary dealers to the full offering—*e.g.*, if there are 10 primary dealers, each primary dealer must bid at least 10% (1/10) of the total offering. This is to ensure that in the unlikely event that no one outside of the primary dealer group bids in a given auction, the auctioned Eurozone Government Bonds will still be purchased by the primary dealers.

37.     In exchange for serving as primary dealers, the banks obtain privileged, non-public information from the Eurozone Government Bond-issuing countries concerning, among other things, the issuances themselves and the borrowing needs of the central governments.

- 10 -

38.     The primary dealers also provide information to Eurozone Government Bond-issuing central governments. Primary dealers often acquire and possess a wealth of information about client demand and order flows in their role as market makers and information aggregators. For example, in the run up to a Eurozone Government Bond auction, primary dealers often take orders from investors—including major financial institutions, pension funds, mutual funds, hedge funds, insurance companies, foundations, and institutional investors—to acquire Eurozone Government Bonds at the auction. By acquiring information about customer demand, primary dealers are able to judge interest in the auction and in turn, the likely trading activity for auctioned debt securities in the secondary market. Given the wealth of information primary dealers acquire through their customers, European countries rely heavily on primary dealers' knowledge of investor appetite to better understand what type of Eurozone Government Bond offering will attract the most interest during the auction and in the secondary market.

**B.      Trading in the Eurozone Government Bond Secondary Market**

39.     After the initial issuance of Eurozone Government Bonds in the primary market, these bonds are further traded among bond dealers and investors—including pension, hedge, and mutual funds; domestic and international banks; insurance companies and other corporations; and state and local governments—in the secondary market. There is typically an active secondary market for Eurozone Government Bonds, including in the United States, with billions of dollars' worth of Eurozone Government Bonds changing hands during the lifetime of the bonds.

40.     Defendants dominate the secondary market, acting as "market-makers" that provide liquidity to investors by standing ready to buy and sell Eurozone Government Bonds whenever an investor seeks to do so.

41.     In fact, Eurozone central governments often require that primary dealers actively quote new Eurozone Government Bond issues to retain their primary dealer status. The governments also monitor the performance of the primary dealers in terms of the volumes they trade and quote in the secondary market. For example, France and Italy rank the performance of their primary dealers in the secondary market in terms of the number and quality of bid and ask quotes and the volume of trades made.

42.     Certain central governments may also demand that primary dealers provide minimum amounts of activity in the secondary market or risk losing their status. For example, Spain requires that in the second market, primary dealers trade a minimum of €5-10 million (depending on the tenor), at a maximum spread of 15-50 euro cents (depending on the tenor) for a minimum of five hours between 8:30 am CET and 17:15 pm CET.

43.     Customers seeking to buy or sell Eurozone Government Bonds will contact one or more banks, such as Bank of America and RBS, or another primary dealer and request pricing for a particular Eurozone Government Bond. The bank will quote the price for a Eurozone Government Bond in terms of a "bid" price or an "ask" price, which are usually set in terms of basis points (one basis point equals 1/100 of one percent). The bid price represents the price at which a dealer will purchase the Eurozone Government Bond; the ask price represents the price at which a dealer will sell the Eurozone Government Bond. The difference between these two values is the "bid-ask spread" (or "spread"), which reflects the dealer's profit for acting as a market maker and assuming the risk that it may be unable to buy or sell the Eurozone Government Bond in the future at better prices than it is quoting at the time to its customer.

44.     As is typical in many financial markets, trading of Eurozone Government Bonds is done through telephonic and, increasingly, electronic means. Orders are taken by salespersons

at dealers and then relayed to bond traders at the banks' trading desks so that they can be filled. Trading desks are typically arranged based on the maturities of the bonds, with traders specializing in short term bonds, medium term bonds, and long term bonds.

45.     Rational customers want to buy low and sell high. Banks and their bond traders, including Defendants, compete for customers based on the bid and ask prices they offer, and, in turn, the spread between them. The narrower the bid-ask spread, the more competitive the prices. A bank can gain customers and business by offering a narrower bid-ask spread than its competitors. Conversely, if a bank widens the bid-ask spread—by either lowering the bid price or raising the ask price—it would likely lose customers to rivals offering narrower spreads. Only through collusion can a dealer quote a wider spread than market conditions otherwise dictate without losing market share and profits.

### C.     Pricing of Eurozone Government Bonds

46.     As with other bonds, the prices of Eurozone Government Bonds are stated in terms of the bond's par value, coupon, maturity date, and yield. A bond's par value is its face value, payable on the bond's maturity date. A bond's coupon is the interest rate that the bond issuer must pay an investor. Coupons are paid to the bond-holder periodically—usually every 6 months, although that can vary—until the bond reaches maturity. Yield is a figure that shows the return that an investor receives by holding the bond to maturity.

47.     Bond prices can be quoted as a function of the bond's par value or its yield. A bond with a par value of €1,000 may sell at a discount of 2%, or €980. A dealer selling this bond would provide its customer a quote of "98." A bond may sell at a discount because its coupon is lower than prevailing interest rates in the marketplace, which means that in order to sell it, the holder must lower the price of the bond to make it competitive with other bonds in the market.

48.     A bond's price can also be quoted terms of its yield. Bond price and yield have an inverse relationship: lowering one will result in a rise in the other, as demonstrated by the chart below:



49.     This inverse relationship is due to the fact that a bond's price will be higher when it pays a coupon that is higher than prevailing interest rates. As market interest rates increase, bond prices decrease. Because yield takes into account both a bond's coupon and its price, yield can be an effective means to compare bonds with different coupons and prices.

**DEFENDANTS' WRONGFUL CONDUCT**

50.     Defendants are among the world's largest traders of Eurozone Government Bonds in both the primary and secondary markets and act as market-makers for Eurozone Government Bonds.

51.     In a competitive market, Defendants compete with each other for customers seeking to buy and sell Eurozone Government Bonds, and they compete to acquire bonds during auctions held by Eurozone Government Bond-issuing central governments.

52.     However, rather than compete with each other, the conspiring banks, including Bank of America and RBS, entered into an illegal scheme to fix the bid-ask spreads for Eurozone Government Bonds that they buy from and sell to investors. This scheme had the same effect as fixing the prices at which investors bought and sold Eurozone Government Bonds. The

conspiring banks' conduct ensured that investors received non-competitive prices for their Eurozone Government Bond trades.

53.     Defendants' scheme was driven by greed and opportunity. Absent an agreement to fix bid and ask prices, no one bank could afford to widen its bid-ask spread unilaterally. To do so would result in that bank losing substantial trading business to competitors offering more competitive pricing. Further, consistently quoting non-competitive bids and asks would risk the bank's position as primary dealer.

54.     According to the European Commission, Eurozone Government Bond traders "exchanged commercially sensitive information and coordinated on trading strategies. These contacts would have taken place mainly—but not exclusively—through online chatrooms."[4]

55.     As was the case in other financial market cartels, in these communications, Defendants' traders exchanged confidential information about their customers' identities and orders (including, among other things, size, direction, and price). The exchange of this sensitive customer information enabled the conspiring traders to coordinate the bid and ask prices they offered to their respective customers.

56.     Eurozone Government Bond market bond traders communicated with each other frequently. The repetitious nature of Defendants' traders' chatroom discussions enabled them to both coordinate on pricing and effectively police their conspiracy. A conspiring bank's trader who failed to adhere to agreed-upon pricing could quickly be identified and barred from any further participation in the chatrooms. Accordingly, the Eurozone Government Bond traders had little incentive to cheat.

---

[4] European Commission, Press Release "Antitrust: Commission sends Statement of Objections in European government bonds cartel" (Jan. 31, 2019), http://europa.eu/rapid/press-release_IP-19-804_en.htm.

57.     By communicating with each other about aligning the prices and spreads they would quote to investors, Defendants also discouraged investors from aggressively comparing prices. Shopping around for better pricing was ultimately a pointless endeavor because the quotes received from one cartel member would be substantially similar to those offered by the other cartel member. From the customer's perspective, the matching quotes would suggest that the prices offered by any one cartel member were competitive. Unbeknownst to the customer, however, these prices were actually the product of collusion between conspiring banks' Eurozone Government Bond traders.

58.     Further, given Defendants' collective power in the Eurozone Government Bonds primary and secondary markets, their fixing of the Eurozone Government Bond prices left their customers little choice but to accept supracompetitive prices for their Eurozone Government Bonds transactions.

59.     The tools used by Defendants to orchestrate their conspiracy are strikingly similar to those used by major foreign exchange ("FX") dealer banks that have been accused of—and in some cases pleaded guilty to—manipulating the FX market. In the FX market, regulators and government enforcers found that FX traders at major dealer banks, including at Defendants Bank of America and RBS, used electronic means, including instant messaging and chatrooms, to discuss and implement collective trading strategies to move key FX benchmarks and trigger customer stop-loss and limit orders. These FX traders were further found to have used these platforms to discuss and fix the spreads of certain FX transactions quoted to customers.

60.     A similar collusive scheme was also recently uncovered by the European Commission in the sovereign, supranational, and agency ("SSA") bond market. In a December 2018 Statement of Objections, the Commission alleged that between 2009 and 2015, participants

"exchanged commercially sensitive information and coordinated on prices of USD SSA bonds" "mainly through online chatrooms."[5] Reports state that one of the targets is Defendant Bank of America.

61.     As a result of Defendants' price-fixing scheme, investors, including Plaintiff and the Class, paid or received supracompetitive prices for Eurozone Government Bonds and, as a result, suffered injury to their business or property.

**INVESTIGATIONS INTO EUROZONE GOVERNMENT BOND MARKET CARTEL**

62.     For the past few years, the Commission has been investigating potential cartel behavior in various sectors of the financial market, including the Eurozone Government Bond market.

63.     On January 31, 2019, the Commission issued a Statement of Objections, a charging instrument that reflects the Commission's preliminary view that an entity (or group of entities) violated the European competition laws. In a press release describing the Statement of Objections, the Commission alleged that "eight banks participated in a collusive scheme that aimed at distorting competition when acquiring and trading European government bonds ('EGBs'). Traders employed by the banks exchanged commercially sensitive information and coordinated on trading strategies. These contacts would have taken place mainly—but not exclusively—through online chatrooms."[6]

64.     The Commission's press release noted that if its "preliminary view were confirmed, such behaviour would violate EU rules that prohibit anticompetitive business

---

[5] European Commission Press Release, Antitrust: Commission sends Statement of Objections in US Dollar supra-sovereign, sovereign, and agency bond trading cartel, (Dec. 20, 2018), http://europa.eu/rapid/press-release_IP-18-6895_en.htm.

[6] European Commission, Press Release, "Antitrust: Commission sends Statement of Objections in European government bonds cartel" (Jan. 31, 2019), http://europa.eu/rapid/press-release_IP-19-804_en.htm.

practices such as collusion on prices (Article 101 of the Treaty on the Functioning of the European Union and Article 53 of the EEA Agreement)."[7]

65.     Should the Commission confirm the violation, the target banks could be subject to fines equal to 10% of the banks' global revenues.

66.     According to sources, Bank of America and RBS were two of the eight banks that received the Commission's Statement of Objections.

## THE EUROZONE GOVERNMENT BOND MARKET STRUCTURE SUPPORTS THE EXISTENCE OF A EUROZONE GOVERNMENT BOND CARTEL

67.     Additional features of the Eurozone Government Bond market support the inference of concerted action by Defendants to fix, raise, maintain, stabilize, or otherwise manipulate the prices of Eurozone Government Bonds.

68.     *First*, Defendants, as primary dealers for Eurozone Government Bonds, wield enormous power in the Eurozone Government Bond market because "most bonds in the auctions are bought by a relatively small number of primary dealers."[8] European central governments and other market participants rely on Bank of America, RBS, and their co-conspirators to make markets and provide liquidity for Eurozone Government Bonds—*i.e.*, to stand ready to trade Eurozone Government Bonds with anyone, at any time. With power concentrated in the hands of a relatively small number of dealers, the conspiring banks were able to form and maintain their cartel.

69.     *Second*, Defendants also had a strong motive to conspire. Avoiding competition enables Defendants to artificially widen bid-ask spreads and retain supracompetitive profits on

---

[7] European Commission, Press Release, "Antitrust: Commission sends Statement of Objections in European government bonds cartel" (Jan. 31, 2019), http://europa.eu/rapid/press-release_IP-19-804_en.htm.

[8] Roel Beetsma, et al., *Price Effects of Sovereign Debt Auctions in the Euro-Zone: The Role of the Crisis*, at 6, Working Paper Series (No. 1595) (Sept. 2013), https://www.ecb.europa.eu/pub/pdf/scpwps/ecbwp1595.pdf.

their Eurozone Government Bond trades with Plaintiff and members of the Class. Defendants, by virtue of their privileged position as primary dealers of Eurozone Government Bonds, have a wealth of knowledge about the offerings themselves, as well as customer identities, demand, trading habits, and order flow in both the primary and secondary market. Sharing this information enabled the conspiring banks to coordinate on bid and ask prices to the detriment of Plaintiff and members of the Class.

70.     **Third**, artificially widening bid-ask spreads would be contrary to any single primary dealer's economic self-interest. If a conspiring bank unilaterally widened its bid-ask spread to customers on a consistent basis, while others failed to do similarly, few would trade with that conspiring bank. Moreover, consistently failing to keep competitive spreads or make markets for customers would jeopardize a conspiring bank's privileged status as a primary dealer with Eurozone Government Bond-issuing central banks, potentially leading to their removal as a primary dealer. If a conspiring bank loses its primary dealer status, it would no longer have privileged access to information from Eurozone central banks. This will, in turn, make that conspiring bank's services less attractive to Eurozone Government Bond customers.

71.     Similarly, the sharing of customer order information would be perilous absent an agreement among competitors. Customers expect banks to maintain the confidentiality of their order information. If any customer were to find out that his or her order information was being shared with another bank, it would be a breach of trust and that customer would refrain from placing orders with that bank in the future.

72.     **Fourth**, there is a high level of communications among Defendants. While a certain amount of communication is necessary for dealers to make markets—*e.g.*, communications concerning general market conditions (market color) is normal—the nature of

the communications between traders at Defendants went far beyond what is necessary. Their traders' use of online chatrooms to exchange specific and confidential customer order information is unnecessary for the purposes of making markets. Its only function is to encourage explicit or tacit collusion among competing traders.

73.     Defendants are also tightly connected through their participation in industry trade groups, such as the Association for Financial Markets in Europe ("AFME"). Within the AFME is the "Primary Dealers board" (the "Board"), which "addresses developments affecting the European government market specifically and aims to build consensus within the industry and acts as a bridge between financial market participants and policymakers." Part of the Board's priorities is to "Actively participate in industry events which focus on rates issues." During the conspiracy, several of the largest Eurozone Government Bond primary dealers had representatives on the Board, including William Scott of Bank of America and Renos Dimitriou of RBS.

74.     Thus, Defendants had ample opportunities to discuss issues affecting the Eurozone Government Bond market with their co-conspirators, including matters affecting the primary and secondary markets for these products.

**SIMILAR WRONGDOING IN OTHER MARKETS SUPPORTS THE PLAUSIBILITY OF DEFENDANTS' MANIPULATION OF EUROZONE GOVERNMENT BONDS**

75.     Defendants' conduct in this case is consistent with similar manipulation, collusion, and other anticompetitive conduct recently uncovered in various financial markets.

76.     Many banks, including Bank of America and RBS and their related entities, have been implicated in or found liable for price-fixing schemes involving other financial products and benchmarks, including SSA bonds, FX rates, various Interbank Offered Rates ("IBORs"), and Swiss franc derivatives.

77.     Further, the methods employed to fix prices in these markets—communications between competing traders through telephone, electronic chatrooms, and instant messaging—are strikingly similar to those used by Defendants' Eurozone Government Bond traders as alleged here.

### D.     SSA Bond Price-Fixing Cartel

78.     The misconduct alleged above is similar in nature to another Commission investigation into the US Dollar-denominated SSA bond market.

79.     On December 20, 2018, the Commission issued a Statement of Objections against four banks—one of which is thought to be Defendant Bank of America—for their participation in a scheme in which the participants "exchanged commercially sensitive information and coordinated on prices of USD SSA bonds."[9] The Commission alleged that between 2009 and 2015, traders had collusive discussions "mainly through online chatrooms."[10]

80.     In addition, the U.S. Department of Justice ("DOJ") has an ongoing criminal investigation into alleged misconduct in the SSA bond market. The DOJ "is investigating allegations that SSA bond traders at different banks agreed [on] prices and shared information on certain US dollar bonds in chatrooms they established for that purpose."[11]

---

[9] European Commission Press Release, Antitrust: Commission sends Statement of Objections in US Dollar supra-sovereign, sovereign, and agency bond trading cartel, (Dec. 20, 2018), http://europa.eu/rapid/press-release_IP-18-6895_en.htm.

[10] European Commission Press Release, Antitrust: Commission sends Statement of Objections in US Dollar supra-sovereign, sovereign, and agency bond trading cartel, (Dec. 20, 2018), http://europa.eu/rapid/press-release_IP-18-6895_en.htm.

[11] Abhinav Ramnarayan & Helene Durand, *EXCLUSIVE – DoJ investigating bond traders over market-rigging,* Int'l Fin. Rev. (Jan. 6, 2016), http://www.ifre.com/exclusive-doj-investigates-bond-traders-over-market-rigging/21230385.article.

81.     Pursuant to its investigation, DOJ "obtained transcripts of online chat-room conversations indicating possible misconduct and asked banks to delve further into the behavior."[12]

82.     Defendant Bank of America recently settled allegations by private plaintiffs in the *In re SSA Bonds Antitrust Litigation*, No. 16-cv-03711 (S.D.N.Y.) that it and other banks engaged in a years' long price-fixing conspiracy in the SSA Bond market. Bank of America settled the class case for $17 million.

**E.     FX Rates Cartel**

83.     Numerous banks, including Defendants Bank of America and Royal Bank of Scotland, were recently fined over $10 billion by various enforcers throughout the world stemming from the banks' conspiracy to manipulate FX benchmarks and fix the bid-ask spreads on FX transactions. Bank of America and related entities paid $455 million, while Royal Bank of Scotland and related entities, paid $1.3 billion. The following graph provides the various fines from and settlements with various enforcers in the United States (Department of Justice ("DOJ"), Commodity Futures Trading Commission ("CFTC"), Office of the Comptroller of the Currency ("OCC"), Federal Reserve Board ("FRB"), and New York Department of Financial Services ("NYDFS")), Brazil (CADE), South Africa (SACC), Switzerland (FINMA), and the United Kingdom (FCA), to date in connection with their manipulation.[13]

---

[12] Suzi Ring & Tom Schoenberg, *U.K. Said to Open Probe Into Rigging of Agency-Bond Market*, Bloomberg (Jan. 20, 2016), http://bloom.bg/1NjWIfO.
[13] http://www.investigationsandregulatoryadvice.com/is-the-trump-administration-charting-a-new-course-away-from-the-duplicative-fines-of-the-financial-crisis/.



84.     The conduct that some of these banks have admitted to includes agreeing to fix the spreads on customer FX transactions; agreeing to enter into trading strategies to manipulate benchmark prices; disclosing confidential customer order information and trading positions; adjusting trading positions to accommodate the interests of the collective group; and trading to trigger customers' limit orders or customers' barrier options for the bank's benefit and to the detriment of those customers.

85.     The OCC and the FRB found that Bank of America's FX traders in the FX spot market routinely communicated with FX traders at other financial institutions through chatrooms. These traders shared confidential customer and proprietary bank information with other FX traders, including customer order flows and bid-ask spreads, and coordinated trading strategies to manipulate spot FX reference rates for their benefit and to the detriment of their customers. The traders also triggered customer stop-loss and limit orders for their own benefit and to the detriment of their customers. In addition, Bank of America's FX traders were found to have engaged in questionable trading strategies, including front-running client orders, that raised "potential conflicts of interest." Bank of America was found to have failed to employ internal policies and procedures that would have enabled them to detect these significant issues.

86.     RBS faced even greater scrutiny, with the DOJ, CFTC, FRB, and FCA each imposing significant fines in connection with RBS's misconduct. RBS pleaded guilty to a felony count under the Sherman Act. According to the plead deal, between December 2007 and January 2013, euro-dollar traders RBS and other banks—self-described members of "The Cartel"

> used an exclusive electronic chat room and coded language to manipulate benchmark exchange rates. Those rates are set through, among other ways, two major daily fixes,' the 1:15 p.m. European Central Bank fix and the 4:00 p.m. World Markets/Reuters fix. Third parties collect trading data at these times to calculate and publish a daily "fix rate," which in turn is used to price orders for many large customers. "The Cartel" traders coordinated their trading of U.S. dollars and euros to manipulate the benchmark rates set at the 1:15 p.m. and 4:00 p.m. fixes in an effort to increase their profits.[14]

87.     Under its plea agreement, RBS agreed to pay $395 million. The CFTC imposed a fine of $290 million for violations of the Commodity Exchange Act. The FRB fined RBS $274 million for violation of various banking laws. Finally, regulators at the FCA imposed fines of $344 million, bringing total fines imposed to $1.3 billion.

88.     Defendants Bank of America and RBS were also named as defendants in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-7789 (S.D.N.Y.), where plaintiffs allege that defendants fixed the bid-ask spreads on FX transactions quoted to customers. Defendant banks' FX traders participated in several electronic chatrooms to discuss and coordinate their FX trading strategies and price-fixing conspiracy. In addition, Bank of America and RBS are alleged to have suspended or terminated certain senior FX traders as a result of their participation in these chatrooms. Bank of America and RBS settled the class case for $180 million and $255 million, respectively.

---

[14] DOJ Press Release, "Five Major Banks Agree to Parent-Level Guilty Pleas," (May 20, 2015), https://www.justice.gov/opa/pr/five-major-banks-agree-parent-level-guilty-pleas.

### F.   **IBOR Cartels**

89.   Several banking entities, including Defendant RBS, have either admitted liability for or pleaded guilty to coordinating and submitting deliberately false quotes in connection with the setting of various IBORs, including the Yen and Swiss Franc London Interbank Offered Rates ("LIBOR"). Total fines in connection with criminal and civil investigations into the Interbank Offered Rates market have exceeded $9 billion.

90.   Joaquín Almunia, then-Commission Vice President in charge of competition policy, said:

> What is shocking about the LIBOR and EURIBOR scandals is not only the manipulation of benchmarks, which is being tackled by financial regulators worldwide, but also the collusion between banks who are supposed to be competing with each other. . . . Healthy competition and transparency are crucial for financial markets to work properly, at the service of the real economy rather than the interests of a few.[15]

91.   The following graph provides a breakdown of the fines from and settlements with enforcers in the U.S. (DOJ, CFTC, NYDFS, State AGs) and Europe (EC, FINMA, FCA, and Dutch Public Prosecutor ("DPP")) to date in connection with their manipulation of different Interbank Offered Rates:[16]

---

[15] Press release, Amended – Antitrust: Commission fines banks €1.49 billion for participating in cartels in the interest rate derivatives industry (Dec. 4, 2013), http://europa.eu/rapid/press-release_IP-13-1208_en.htm.

[16] http://www.investigationsandregulatoryadvice.com/is-the-trump-administration-charting-a-new-course-away-from-the-duplicative-fines-of-the-financial-crisis/.



92.     RBS entered into a deferred prosecution agreement with DOJ to resolve a

criminal investigation, and a Japanese RBS subsidiary pleaded guilty to felony wire fraud.

According to the deferred prosecution and plea agreements:

> at various times from at least 2006 through 2010, certain RBS Yen
> and Swiss Franc derivatives traders – whose compensation was
> directly connected to their success in trading financial products
> tied to LIBOR – engaged in efforts to move LIBOR in a direction
> favorable to their trading positions. Through these schemes, RBS
> allegedly defrauded counterparties who were unaware of the
> manipulation affecting financial products referencing Yen and
> Swiss Franc LIBOR. The alleged schemes included hundreds of
> instances in which RBS employees sought to influence LIBOR
> submissions in a manner favorable to their trading positions in two
> principal ways: internally at RBS through requests by derivatives
> traders for Yen and Swiss Franc LIBOR submissions, and
> externally through an agreement with a separately charged
> derivatives trader to request Yen LIBOR submissions.[17]

RBS traders coordinated these unlawful practices through "the use of electronic communications,

which included both emails and electronic chats."[18]

---

[17] DOJ Press Release, RBS Securities Japan Limited Agrees to Plead Guilty in Connection with Long-Running Manipulation of Libor Benchmark Interest Rates (Feb. 6, 2013), https://www.justice.gov/opa/pr/rbs-securities-japan-limited-agrees-plead-guilty-connection-long-running-manipulation-libor.

[18] *Id.*

93.     RBS was also fined $325 million by the CFTC and another $137 million by the FCA.

### G.    Swiss Franc Derivatives Bid-Ask Spread Fixing Cartel

94.     On October 21, 2014, the Commission imposed fines of nearly €32.4 million ($41.2 million at the time of the fines) against four banks, including RBS. The Commission found that between May 2007 and September 2007, the banks "agreed to quote to all third parties wider, fixed bid-ask spreads on certain categories of short term over-the-counter Swiss franc interest rate derivatives, whilst maintaining narrower spreads for trades among themselves."[19]

95.     The purported aim of the cartel was to "lower the parties' own transaction costs and maintain liquidity between them whilst seeking to impose wider spreads on third parties. Another objective of the collusion was to prevent other market players from competing on the same terms as these four major players in the Swiss franc derivatives market."[20]

## DEFENDANTS' UNLAWFUL CONDUCT INJURED PLAINTIFF AND THE CLASS

96.     Plaintiff and members of the Class purchased and sold hundreds of millions, if not billions, of dollars' worth of Eurozone Government Bonds directly from Defendants in the United States. Defendants' unlawful price manipulation of Eurozone Government Bonds deprived Plaintiff and members of the Class of a competitive and transparent marketplace free from collusion.

97.     Defendants have also harmed investors by artificially inflating the cost of their Eurozone Government Bond transactions—either by inflating the bid price or depressing ask price. In doing so, Defendants were able to extract supracompetitive profits from their dealings

---

[19] Press Release, Antitrust: Commission settles cartel on bid-ask spreads charged on Swiss Franc interest rate derivatives; fines four major banks €32.3 million (Oct. 21, 2014), http://europa.eu/rapid/press-release_IP-14-1190_en.htm.

[20] *Id.*

with Plaintiff and the Class. Absent Defendants' conspiracy, Plaintiff and the Class would have paid less money for their Eurozone Government Bond purchases and would have received more money for their Eurozone Government Bond sales.

98.     Accordingly, Defendants' anticompetitive conduct has injured investors in the United States, including Plaintiff and members of the Class in their business or property.

## CLASS ACTION ALLEGATIONS

99.     Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking relief on behalf of the following class (the "Class"):

> All persons or entities who purchased or sold Eurozone Government Bonds in the United States directly from Defendants from at least as early as January 1, 2007 through at least December 31, 2012 (the "Class Period").

> Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States Government.

100.     Plaintiff believes that there are thousands of Class members, making the Class so numerous and geographically dispersed that joinder of all Class Members is impracticable.

101.     There are questions of law and fact common to the Class that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)     Whether Defendants engaged in a combination or conspiracy to fix, raise, maintain, stabilize, or otherwise manipulate the prices for Eurozone Government Bonds in violation of the Sherman Act;

(b)     The identity of the participants in the conspiracy;

(c)     The duration of the conspiracy;

(d)     The nature and character of the acts performed by Defendants in furtherance of the conspiracy;

(e)     Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Class;

(f)     Whether Defendants fraudulently concealed the conspiracy's existence from Plaintiff and the Class; and

(g)     The appropriate measure of damages sustained by Plaintiff and the Class.

102.    Plaintiff's claims are typical of the claims of the other Class members. Plaintiff and Class members sustained damages arising out of Defendants' common course of conduct in violation of the law as described in this Complaint. The injuries and damages of each Class member were directly caused by Defendants' wrongful conduct.

103.    Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff is an adequate representative of the Class and has no interests adverse to the interests of absent Class members. Plaintiff has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

104.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications.

105.    The questions of law and fact common to the Class members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

106.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously,

efficiently, and without duplication of effort and expense that numerous, separate individual actions, or repetitive litigation, would entail. The Class is readily definable and is one for which records should exist in the files of Defendants, Class members, or the public record. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate the claims alleged herein, including those for antitrust. This class action presents no difficulties of management that would preclude its maintenance as a class action.

### DEFENDANTS' FRAUDULENTLY CONCEALED THEIR MISCONDUCT

107.    Defendants concealed their wrongdoing in manipulating the prices of Eurozone Government Bonds sold to investors. Thus, the statutes of limitations relating to the claims for relief alleged below were tolled due both to Defendants' affirmative acts of concealment and the inherently self-concealing nature of their private, unregulated conduct.

108.    Defendants' success in concealing their collusion was facilitated by their tremendous control over the market for Eurozone Government Bonds.

109.    Neither Plaintiff nor Class members knew of Defendants' unlawful and self-concealing manipulative acts and could not have discovered them by the exercise of reasonable due diligence, if at all, at least prior to public reports disclosing the European Commission's Statement of Objections concerning the Eurozone Government Bond market. Plaintiff and the Class also lacked any basis for identifying the wrongdoers or calculating damages before that date. In fact, Defendants' collusive activities were so well-hidden that regulators in Europe and elsewhere unaware of such conduct for years.

110.    Only after recent public reports disclosed the European Commission's Statement of Objections concerning the Eurozone Government Bond market did Plaintiff have a sufficient basis to investigate Defendants' possible collusion in the Eurozone Government Bond market.

111.     Reasonable due diligence could not have uncovered the conspiracy because:
(i) Defendants' trading positions and trading strategies in the Eurozone Government Bond
market are not publicly available; (ii) the bilateral, non-exchange traded nature of Eurozone
Government Bond transactions make observing anticompetitive behavior in that market
exceedingly difficult; (iii) the highly specialized and esoteric nature of the different aspects of
the Eurozone Government Bond market makes it exceedingly difficult for an ordinary person to
assess improprieties; and (iv) neither Bank of America nor RBS nor any of their co-conspirators
told Plaintiff or other Class members that they were conspiring to fix, stabilize, maintain, and/or
otherwise manipulate the prices of Eurozone Government Bonds.

112.     Defendants also took active steps to conceal evidence of their misconduct from
Plaintiff, the Class, government regulators, and the public by, among other things: (i) holding out
their activities in the Eurozone Government Bond market as good faith market-making conduct;
(ii) maintaining the secrecy of their price-fixing scheme; (iii) avoiding any discussion in public
fora regarding their collusive activities and manipulation of Eurozone Government Bond prices;
and (iv) using non-public proprietary electronic communication platforms (*e.g.*, instant
messaging, electronic chatrooms, etc.) to coordinate trading strategies.

113.     In addition, Defendants also failed to have the proper internal controls in place to
detect misconduct concerning price-fixing of Eurozone Government Bonds. Such internal
failures made it all the more difficult for Plaintiff, the Class, government regulators, and the
public to become aware of Defendants' misconduct.

114.     As a result of Defendants' affirmative steps to conceal their improper conduct;
their willful decision not to put in place proper controls to detect improper conduct; the self-
concealing nature of the price-fixing conspiracy; and the resulting lack of public information

about material aspects of the conspiracy, collusion, and trading based on nonpublic information, the statutes of limitations was tolled for Plaintiff's claims.

## FIRST CLAIM FOR RELIEF

### VIOLATION OF 15 U.S.C. § 1
### CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE

115.    Plaintiff incorporates the preceding paragraphs by reference.

116.    Defendants entered into and engaged in a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

117.    During the Class Period, Defendants entered into an agreement to reduce competition among themselves by fixing and manipulating Eurozone Government Bond prices sold in the United States and elsewhere.

118.    This conspiracy to manipulate Eurozone Government Bond prices caused injury to both Plaintiff and the Class by depriving them of the benefit of competitive Eurozone Government Bond prices reflecting true market conditions for some period during and following Defendants' unlawful conduct, and thus Plaintiff and the Class received, upon execution of their trades, less in value than they would have received absent Defendants' wrongful conduct.

119.    The conspiracy is a *per se* violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the Eurozone Government Bond market. There is no legitimate business justification for, or pro-competitive benefits from, Defendants' conduct. Furthermore, any business justification is outweighed by the anticompetitive effects of their illegal conduct.

120.    As a direct and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiff and the Class have been injured in their business and property throughout the Class Period.

121.    Plaintiff and the Class are entitled to treble damages for the violations of the Sherman Act alleged in this Complaint.

## RELIEF REQUESTED

Accordingly, Plaintiff demands relief as follows:

(A)    That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as a class representative, that Plaintiff's counsel be appointed as counsel for the Class, and that the Court directs that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class

(B)    That the unlawful conduct alleged in the Complaint be adjudged and decreed to violate Section 1 of the Sherman Act;

(C)    That the Court awards Plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest at the highest legal rate;

(D)    That the Court awards Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

(E)    That the Court directs such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: March 4, 2019                    Respectfully submitted,

By: /s/ David A. Slossberg
**HURWITZ SAGARIN SLOSSBERG**
**& KNUFF, LLC**
DAVID A. SLOSSBERG (ct13116)
DAVID L. BELT (ct04274)
JEFFREY P. NICHOLS (ct29547)
147 North Broad Street
Milford, CT 06460
Tel: (203) 877-8000
Fax: (203) 878-9800
Email:
dslossberg@hssklaw.com
dbelt@hssklaw.com
jnichols@hssklaw.com

GREGORY S. ASCIOLLA (PHV pending)
JAY L. HIMES (PHV pending)
KARIN E. GARVEY (PHV pending)
CHRISTOPHER J. MCDONALD (PHV pending)
ROBIN A. VAN DER MEULEN (PHV pending)
MATTHEW J. PEREZ (PHV pending)
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
Email:
gasciolla@labaton.com
jhimes@labaton.com
kgarvey@labaton.com
cmcdonald@labaton.com
rvandermeulen@labaton.com
mperez@labaton.com

DEBORAH H. RENNER (PHV pending)
CLAIBORNE R. HANE (PHV pending)
**PIERCE BAINBRIDGE**
**BECK PRICE & HECHT LLP**
277 Park Avenue, 45th Floor
New York, New York 10017
Tel: (212) 484-9866
Email:
drenner@piercebainbridge.com
chane@piercebainbridge.com

THOMAS D. WARREN (PHV pending)
**PIERCE BAINBRIDGE**
**BECK PRICE & HECHT LLP**
355 S. Grand Avenue, Suite 4400
Los Angeles, CA 90017
Tel: (213) 262-9333
Email:
twarren@piercebainbridge.com

*Counsel for Plaintiff Electrical Workers Pension
Fund Local 103 I.B.E.W. and the Proposed Class*